**DAVIDSON AND GRAHAM CON-STRUCTION COMPANY,**
Appellant,

v.

**Ray S. McKEE, Appellee.**

Supreme Court of Tennessee.

March 6, 1978.

W. Frank Brown, III, Breazeale & Brown, Chattanooga, for appellant.

Russell J. Bean, Bean, Bean & Bean, Chattanooga, for appellee.

FONES, Justice.

OPINION

Defendant, Davidson and Graham Construction Company, appeals from the decree of the trial court awarding workmen's compensation benefits for a ninety (90%) percent permanent partial disability of plaintiff's left eye.

Defendant insists that the statute of limitations began to run on May 8, 1975, the date of the accident and injury to plaintiff's eye; that the filing of this action on January 11, 1977, more than one (1) year later, was barred.

The trial judge expressly found that plaintiff did not know there would be any permanent retinal damage to his eye until so informed by Dr. Dahrling in April, 1976, and that the suit was timely filed.

Plaintiff, Ray S. McKee, was working as a lead carpenter framing cornices on the back of a house. While he was nailing the frame overhead, a sixteen penny nail flipped from under his hammer and stuck in his left eye. He pulled the nail out, drove home and then to Memorial Hospital where he was referred to Dr. Arnold, an ophthalmologist. After examination at Dr. Arnold's office, he was admitted to Erlanger Hospital. Doctor Arnold testified that

McKee sustained a laceration of the sclera, that it was punctured, and some fluid leaked out. Surgery was performed at the hospital to repair the laceration and excise the iris prolapse. Plaintiff was discharged on May 12, 1975.

Plaintiff was seen by Dr. Arnold on May 15, 19, and 26, 1975. On the May 26 office visit, vision in his left eye was 20/20. He was examined by Dr. Arnold on June 7, and 16, and was told he could return to work.

Plaintiff testified that he had headaches and flashes of light and that sometime around September, 1975, he developed a hazing in his left eye. However, he did not see a doctor from June, 1975, until he returned to Dr. Arnold's office January 5, 1976.

Doctor Arnold found his vision to be 20/60 in the left eye and 20/30 in the right eye. He testified that he could not find anything wrong with plaintiff's eyes, so he referred him to Dr. Dahrling, an ophthalmologist who specializes in disorders of the retina.

Doctor Dahrling testified that when he examined plaintiff on January 14, 1976, his retinas looked good, and he explained to plaintiff that, "we really didn't see anything wrong, that we felt that perhaps he was suffering some of this distortion from traction on the retina by the vitreous and told him that we'd like to check him again in three months."

Plaintiff returned to Dr. Dahrling on April 5, 1976. The doctor testified that he became a bit concerned about what was going on because he didn't find anything wrong to explain plaintiff's problem. He sent plaintiff back to Dr. Arnold to make certain there was nothing in the front part of the eye, the cornea, or the lens, that could account for plaintiff's problem, and he also instructed plaintiff to return to his office in three (3) months. However, plaintiff returned in May complaining of pain in the left eye of two (2) days duration. Doctor Dahrling found that he had cells in the vitreous, indicating an inflammatory reaction. Plaintiff was given an injection of celestone and put on cortisone drops. On

his next visit, late in May, his vitreous was much clearer. Doctor Dahrling also saw plaintiff in July, September and November. Again Dr. Dahrling became concerned because he could find no condition that would explain plaintiff's loss of vision and visual field and he sent plaintiff to Dr. Ira Long for examination. Doctor Long's report, dated December 16, 1976, stated that he could not discover any organic cause for plaintiff's visual problems.

The only diagnosis of an organic condition made by Dr. Dahrling was vitreitis, a posterior vitreous detachment, and he found it difficult to account for the degree of loss of vision and the visual field loss on the basis of vitreitis. At one point in his testimony he described the degree of plaintiff's loss as "surprising if one tries to relate to the vitreitis." He indicated that vitreitis can usually be controlled by cortisone type preparations. Doctor Dahrling explained that plaintiff's visual field was less than five degrees in the left eye, which gave rise to concern about the possibility of neurologic problems in the optic nerve. However, he said that any injury to the optic nerve would be indicated by a whitening of the nerve within two (2) to six (6) months and that no evidence of nerve damage had yet appeared.

In *Griffitts v. Humphrey*, 199 Tenn. 528, 288 S.W.2d 1 (1955), the Court resolved the question of whether the date of the accident or the date of known disability triggers the statute of limitations. The conflict arising from the use of the word "accident" in Tennessee Code Annotated § 50–1003 and "injury" in Tennessee Code Annotated § 50–1017 and the conflicting interpretations of those statutes in *Graham v. J. W. Wells Brick Co.*, 150 Tenn. 660, 266 S.W. 770 (1924), and *Ogle v. Tenn. Eastman Corp.*, 185 Tenn. 527, 206 S.W.2d 909 (1947), were discussed at length. In overruling *Graham* and approving the result of *Ogle*, the Court gave as its principal reason for adopting the date of the injury rather than the date of the accident as the beginning date of the statute of limitations, the rationale of *Salt Lake City v. Industrial Commission*, 93

Utah 510, 74 P.2d 657 (1939). The crux of that rationale is found in the following excerpt from the lengthy quote in *Griffitts*:

"Not until there is an accident and injury and a disability or loss from the injury does the duty to pay arise. A mere accident does not impose the duty to pay. Accident plus injury therefrom does not impose the duty. But accident plus injury which results in disability or loss gives rise to the duty to pay. When the employer refuses or ceases to pay compensation, the cause of action against him arises." 288 S.W.2d at 4.

The *Griffitts* decision has been consistently followed by this Court. Of particular significance here, the Court in *Imperial Shirt Corporation v. Jenkins*, 217 Tenn. 602, 399 S.W.2d 757 (1966), quoted with approval from Larson on Workmen's Compensation, Volume 2 § 78.41 page 261, the following:

"*A fortiori*, his claim should not be barred when qualified physicians have been unable to present him with a diagnosis of his condition within the period of limitations."

Defendant, in insisting that the statute began to run on May 8, 1975, relies upon the fact that plaintiff had problems with a flashing effect in his left eye almost continually after the injury, and he developed a hazing problem in September, 1975. From these conditions, defendant seemingly insists that plaintiff should have known that he would have a permanent disability in his left eye.

Plaintiff testified that Dr. Arnold told him the flashing in his left eye would clear up. While Dr. Arnold, whose deposition was taken two (2) weeks before trial, was not expressly asked whether or not he told plaintiff the flashing would clear up, it is unmistakable from his testimony that when he saw plaintiff on June 16, 1975, he thought plaintiff had made an uneventful recovery from his injury, could see 20/20 with his left eye, and further that, "his eye looked good."

When plaintiff returned to Dr. Arnold's office on January 5, 1976, complaining of flashing, hazing and reduced vision, Dr. Arnold could not find any organic condition to account for these problems. With respect to that visit, he was asked on cross-examination, and answered:

Q. This flashing condition he stated that he had for some time, that he had had since the surgery, did this condition or this revelation to you, did that bother you so far as his previous recovery was concerned?

A. He looked all right at the time when I saw him. Of course, his vision apparently was down. He was complaining of this. That's why I thought we would get a retinal specialist to look at it.

. . . . .

Q. Did you make any statement or give any explanation as to why the reference was given?

A. I don't recall, but I probably said that since he is complaining of flashes of light, and I didn't see anything wrong, I would send him up and let somebody else look at him.

Doctor Dahrling testified at the trial of this case. After the lawyers had completed their examination of the witness, the trial judge asked him if plaintiff was first advised in April, 1976, that he had a retina problem. The witness said that he advised plaintiff of retinal symptoms on April 6, 1976, and had a notation on his record to that effect. He added that it was possible that he could have mentioned it earlier, because of a ritual that he usually goes through, but on the other hand that he usually made a note on his chart when he did that.

It is immaterial to the result of this case whether Dr. Dahrling mentioned the possibility of a retina problem that could result in permanent disability at the April 6, visit or earlier. He first saw plaintiff January 14, 1976, and this suit was filed January 11, 1977. Further, from our careful examination of Dr. Dahrling's testimony, we think it implicit that he entertained the hope and expectation that plaintiff would not have a permanent disability when he saw plaintiff

in January, and April of 1976, and perhaps for several months beyond April. In fact, there is no express testimony in the record that Dr. Dahrling ever told plaintiff that his "retina symptoms" could or might result in permanent disability. There is merely an implication that he may have told plaintiff of the potentiality of permanent damage. It is clear that as late as December, 1976, neither Dr. Arnold, Dr. Dahrling nor Dr. Long had been able to find any organic condition that could account for plaintiff's loss of vision. It is reasonable to assume that all three (3) doctors continued to be surprised that plaintiff had visual problems of the scope and permanency that he continued to evince. There is no evidence whatever that plaintiff did not share their optimism and we, of course, cannot attribute knowledge to the plaintiff of his prognosis superior to that of the doctors.

Defendant's reliance upon *Reed v. Genesco, Inc.*, 512 S.W.2d 1 (Tenn.1974), and *Taylor v. Clayton Mobile Homes, Inc.*, 516 S.W.2d 72 (Tenn.1974) is misplaced, in our opinion. In *Reed*, plaintiff was advised by his physician more than one (1) year prior to filing suit that he had a detached retina and should have surgery. In *Taylor*, employee sustained a fracture of the sacrum and an injury to her cervical spine in an accident that occurred on September 21, 1971. She recovered from the fracture of the sacrum without any permanent disability, or loss of time from work and her medical expenses for that injury were paid. She filed suit on August 23, 1973, for the injuries to her cervical spine that resulted in a laminectomy in February, 1973. Ms. Taylor testified that for the first two months after the accident the pain in her sacrum was so severe that she paid no attention to the discomfort in her neck; that she went to Dr. Smith in July or August, 1972, and he hospitalized her on August 21, 1972, for conservative treatment of her cervical spine and she was discharged without obtaining any substantial relief.

In the *Taylor* case, plaintiff's testimony revealed the presence of continued and persistent pain in the cervical area from the date of the accident, plus hospitalization more than one year prior to filing suit, for treatment of that condition without beneficial results. The trial judge found that she had sufficient knowledge of a compensable injury more than one year prior to filing suit and this Court found material evidence to support his judgment.

In the instant case, the evidence supports a finding that plaintiff and his doctor thought he had made a complete recovery from the injury to his left eye, in June, 1975. He had 20/20 vision and his "eye looked good." Doctor Arnold found nothing on January 5, 1976, to reverse that opinion. Whatever apprehension the doctor may have entertained because McKee's vision was less than 20/20, he did not reveal to McKee when he sent him to Dr. Dahrling. On January 14, 1976, Dr. Dahrling told plaintiff that he "really did not see anything wrong." Thus, the distinguishing feature of this case is that plaintiff had been led to believe that, medically, he had made a full recovery, and a fortiori, had no compensable injury. It was not until April, 1976, that his doctors gave him any information to the contrary.

The trial judge has rejected defendant's insistence that the mere fact that he had problems with his vision between June, 1975, and January, 1976, was sufficient to charge him with knowledge of a compensable injury. We think there is material evidence to support a finding that McKee was entitled to rely on the full recovery status of his eye in June, 1975, until a date beyond January 11, 1976, one year prior to the filing of this suit.

There is no merit to defendant's contention that the award of ninety (90%) percent disability was erroneous because it was not causally connected to the injury. Doctor Dahrling testified that it was so connected.

Affirmed. Costs are adjudged against defendant, Davidson and Graham Construction Company. The cause is remanded to the trial court for the enforcement of the decree.

HENRY, C. J., and COOPER, BROCK and HARBISON, JJ., concur.